******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ANTONIO VITTI *v.* CITY OF MILFORD ET AL.
(AC 40399)

Sheldon, Keller and Moll, Js.*

*Syllabus*

The defendant city of Milford appealed to this court from the decision of the Compensation Review Board affirming the finding and award rendered by the Workers' Compensation Commissioner ordering the city to pay to the plaintiff, a police officer, all benefits required by the Workers' Compensation Act (§ 31-275 et seq.) pursuant to the statute (§ 7-433c) that entitles a police officer or firefighter to receive such benefits from a municipal employer if, while on or off duty, the officer or firefighter suffers any medical condition caused by hypertension or heart disease that results in a disability. In 1992, No. 92-81 of the 1992 Public Acts (P.A. 92-81) amended § 7-433c, and that amendment was codified in the 1993 revision of § 7-433c, which was in effect on the date of the plaintiff's hire in 1993. Pursuant to that amendment, police officers and firefighters who began their employment on or after July 1, 1992, would be ineligible to receive benefits pursuant to the statute under certain circumstances, including if they completed two years of service and their employer proved by a preponderance of the evidence that their health condition or impairment caused by hypertension or heart disease was not job related. In 1996, § 7-433c was again amended pursuant to No. 96-230 of the 1996 Public Acts (P.A. 96-230), which removed the eligibility restrictions under P.A. 92-81, eliminated the rebuttable presumption and restored a conclusive presumption, and included a provision that police officers or firefighters who began employment on or after July 1, 1996, were not eligible for benefits under that section. The 1996 amendments were codified in the 2009 revision of § 7-433c, which was in effect on the date of the plaintiff's injury in 2010. W, a cardiologist, had determined that the plaintiff was suffering from giant cell myocarditis. Subsequently, the plaintiff filed a timely notice of claim with the Workers' Compensation Commission. Following formal hearings, the commissioner rendered his initial finding and award in favor of the plaintiff. The commissioner had applied P.A. 92-81 contained in the 1993 version of § 7-433c, which was in effect on the date of the plaintiff's hire, and found that the plaintiff's giant cell myocarditis constituted heart disease and that the city had failed to rebut the statutory presumption that the plaintiff's health condition or impairment caused by heart disease was causally related to his employment with the city. On appeal, the board vacated the commissioner's finding and award and remanded the matter for additional proceedings, concluding that the commissioner had committed plain error by applying the 1993 version of § 7-433c rather than the 2010 version that was in effect at the date of the plaintiff's injury. After additional hearings, in December, 2015, the commissioner issued a finding and award in favor of the plaintiff, finding that the plaintiff's giant cell myocarditis constituted heart disease pursuant to the 2010 version of § 7-433c and ordering the city to pay all benefits due to the plaintiff under the act, and the board affirmed the commissioner's finding and award. On the city's appeal to this court, *held*:

1. The board properly applied to the plaintiff's claim the version of § 7-433c that was in effect on the date of the plaintiff's injury in 2010: the 2010 version of § 7-433c, by its express terms, makes clear that the benefits provided by the statute are not available to those police officers and firefighters who began employment on or after July 1, 1996, and contains no language that makes any distinction among persons who began employment prior to that date, and although the city relied on the legislative purpose underlying the adoption of P.A. 92-81, which was to provide municipalities with financial relief by replacing a conclusive presumption of causation with a rebuttable presumption, the city cited to no maxim of statutory interpretation or any other authority for the proposition that, in the absence of statutory language permitting such an exercise, this court could disregard the language of a statute in order

---

* The listing of judges reflects their seniority status on this court as of the date of oral argument.

to advance the legislative purpose of repealed legislation; moreover, even if the 2010 version of § 7-433c could be deemed ambiguous as to the legislature's intended treatment of those persons who began employment prior to July 1, 1996, and the opportunity for municipal employers to rebut the presumption in the context of claims made by such claimants, the relevant legislative history supported the conclusion that the 1993 revision of § 7-433c did not apply to the plaintiff's claim, as the legislative history underlying the General Assembly's replacement of the rebuttable presumption with a conclusive presumption in 1996 revealed that the General Assembly intended for all police officers and firefighters hired prior to July 1, 1996, to be grandfathered in, in an effort to balance the financial concerns of municipalities with the expectations of those police officers and firefighters already employed, and the legislative history was silent as to any legislative intent to have P.A. 92-81 apply to those police officers or firefighters who were hired on or after July 1, 1992, but prior to July 1, 1996; furthermore, the application of the 2010 version of § 7-433c to the plaintiff's claim was consistent with the common-law date of injury rule, which requires courts to look to the statute in effect on the date on which the claimant suffered his or her injury to determine the substantive rights and obligations that exist between the parties.

2. The city could not prevail on its claim that the board erred as a matter of law by affirming the commissioner's finding that the plaintiff's giant cell myocarditis constituted heart disease under § 7-433c, which was based on the city's claim that, regardless of which version of § 7-433c applied to the plaintiff's claim, it presented evidence to the commissioner establishing that giant cell myocarditis was not heart disease but, rather, was a systemic autoimmune disease involving an agent produced by the body outside of the heart; there was sufficient evidence in the record to support the commissioner's finding that the plaintiff's giant cell myocarditis constituted heart disease under § 7-433c, as the commissioner found credible and more persuasive the testimony of W that giant cell myocarditis was a rare disease of inflammation of the heart, and found that W credibly distinguished giant cell myocarditis from sarcoidosis, which is a systemic disease and presents as scar tissue that forms in the lungs or other organs and is not confined to the heart, and it was within the commissioner's purview to credit W's testimony.

Argued October 12, 2018—officially released June 4, 2019

*Procedural History*

Appeal from the decision of the Workers' Compensation Commissioner for the Third District ordering the defendants to pay workers' compensation benefits to the plaintiff, brought to the Compensation Review Board, which affirmed the commissioner's decision, and the named defendant appealed to this court. *Affirmed.*

*Scott W. Williams*, with whom, on the brief, were *James D. Moran, Jr.*, and *Maribeth M. McGloin*, for the appellant (named defendant).

*David J. Morrissey*, for the appellee (plaintiff).

*Opinion*

MOLL, J. The principal issue in this appeal is whether the plaintiff's claim for heart and hypertension benefits under General Statutes § 7-433c is governed by the version of the statute in effect on the date of the plaintiff's hire or the date of his injury. The named defendant, the city of Milford (defendant),[1] appeals from the decision of the Compensation Review Board (board) affirming the finding and award rendered by the Workers' Compensation Commissioner for the Third District (commissioner) of the Workers' Compensation Commission (commission), ordering the defendant to pay to the plaintiff, Antonio Vitti, all benefits required by the Workers' Compensation Act (act), General Statutes § 31-275 et seq.[2] On appeal, the defendant claims that the board erred, as a matter of law, by (1) applying to the plaintiff's claim the version of § 7-433c that was in effect on the date of the plaintiff's injury in 2010 (2010 version),[3] rather than the version of § 7-433c that was in effect on the date of the plaintiff's hire in 1993 (1993 version),[4] and (2) affirming the commissioner's finding that the plaintiff's giant cell myocarditis qualifies as heart disease under § 7-433c.[5] We disagree and, accordingly, affirm the decision of the board.

The following procedural history and facts, as found by the commissioner in his finding and award, dated December 3, 2015, are relevant to our resolution of this appeal. On February 12, 1993, the defendant hired the plaintiff as a police officer after the plaintiff underwent a preemployment physical examination and was deemed suitable for employment. On August 17, 2010, the plaintiff consulted a doctor after experiencing nausea, abdominal pain, and shortness of breath for several days. At his wife's urging, the plaintiff also consulted a cardiologist, who performed an electrocardiogram that supported a differential diagnosis of coronary artery disease or cardiomyopathy. The plaintiff was later transferred to the Hospital of Saint Raphael, where he underwent a cardiac catheterization that revealed that he had mild coronary artery disease and severe systolic dysfunction. On August 20, 2010, a magnetic resonance imaging scan confirmed the electrocardiogram results and raised the possibility that the plaintiff had myocarditis. On August 23, 2010, the plaintiff was put on an intra-aortic balloon pump for cardiac support. Diagnostic tests indicated a progression of heart failure. The plaintiff was prescribed prednisone, a drug used as an immunosuppressive therapy. On August 24, 2010, he was admitted to Hartford Hospital with a diagnosis of acute myocarditis and cardiogenic shock and began to receive treatment from a cardiologist, Detlef Wencker. Dr. Wencker performed a number of tests and determined that the plaintiff needed a heart transplant. On September 29, 2010, the plaintiff underwent successful heart transplant surgery. A specimen of the plaintiff's

heart that was harvested and analyzed showed evidence of giant cell myocarditis; Dr. Wencker, thus, determined that the plaintiff was suffering from giant cell myocarditis. The plaintiff later returned to employment with the defendant's police department.

Meanwhile, on September 10, 2010, the plaintiff filed a timely notice of claim with the commission, noting August 19, 2010, as the date of his injury. On August 14, 2013, after holding formal hearings on the matter, the commissioner, then acting for the fourth district of the commission, issued a finding and award in favor of the plaintiff. The commissioner found, inter alia, that the plaintiff's giant cell myocarditis constituted heart disease pursuant to the 1993 version of § 7-433c[6] and that the defendant had failed to rebut the statutory presumption that the plaintiff's health condition or impairment caused by heart disease was causally related to his employment with the defendant. Accordingly, the commissioner ordered the defendant to pay all benefits due to the plaintiff as required by the act. Thereafter, the defendant filed a petition for review with the board.

On September 16, 2014, the board rendered its decision, concluding that (1) some of the commissioner's factual findings were inconsistent with his other findings, and (2) the commissioner had committed plain error by applying the 1993 version of § 7-433c rather than the 2010 version that was in effect on the date of the plaintiff's injury. Thereupon, the board vacated the commissioner's August 14, 2013 finding and award and remanded the matter for additional proceedings.

On December 3, 2015, after holding additional formal hearings on the matter, the commissioner, acting for the third district of the commission, issued a finding and award in favor of the plaintiff.[7] The commissioner found, inter alia, that the plaintiff's giant cell myocarditis constituted heart disease pursuant to the 2010 version of § 7-433c and ordered the defendant to pay all benefits due to the plaintiff under the act. Thereafter, the defendant filed a petition for review with the board.[8]

On appeal before the board, the defendant claimed that the commissioner's conclusion was legally inconsistent with his factual findings and that the commissioner erred as a matter of law by failing to apply the 1993 version of § 7-433c to his claim. On April 21, 2017, the board affirmed the commissioner's December 3, 2015 finding and award. This appeal followed.

At the outset, we set forth the standard of review and corresponding legal principles applicable to the defendant's claims. "[T]he principles [governing] our standard of review in workers' compensation appeals are well established. . . . The board sits as an appellate tribunal reviewing the decision of the commissioner. . . . [T]he review . . . of an appeal from the commissioner is not a de novo hearing of the facts.

. . . [Rather, the] power and duty of determining the facts rests on the commissioner [and] . . . [t]he commissioner is the sole arbiter of the weight of the evidence and the credibility of witnesses . . . . Where the subordinate facts allow for diverse inferences, the commissioner's selection of the inference to be drawn must stand unless it is based on an incorrect application of the law to the subordinate facts or from an inference illegally or unreasonably drawn from them. . . .

"This court's review of [the board's] decisions . . . is similarly limited. . . . The conclusions drawn by [the commissioner] from the facts found must stand unless they result from an incorrect application of the law to the subordinate facts or from an inference illegally or unreasonably drawn from them. . . . [W]e must interpret [the commissioner's finding] with the goal of sustaining that conclusion in light of all of the other supporting evidence. . . . Once the commissioner makes a factual finding, [we are] bound by that finding if there is evidence in the record to support it." (Internal quotation marks omitted.) *Melendez* v. *Fresh Start General Remodeling & Contracting, LLC*, 180 Conn. App. 355, 362, 183 A.3d 670 (2018).

"It is well established that [a]lthough not dispositive, we accord great weight to the construction given to the workers' compensation statutes by the commissioner and [the] board. . . . A state agency is not entitled, however, to special deference when its determination of a question of law has not previously been subject to judicial scrutiny. . . . Where . . . [a workers' compensation] appeal involves an issue of statutory construction that has not yet been subjected to judicial scrutiny, this court has plenary power to review the administrative decision." (Citations omitted; internal quotation marks omitted.) *Lafayette* v. *General Dynamics Corp.*, 255 Conn. 762, 770–71, 770 A.2d 1 (2001). Mindful of the foregoing, we now address the defendant's claims.

I

The defendant first claims that the board erred as a matter of law by applying the 2010 version of § 7-433c to the plaintiff's claim. Specifically, the defendant argues that the board should have applied the 1993 version of § 7-433c, containing a rebuttable presumption, in order to effectuate the legislative purpose underlying such legislation, namely, to provide financial relief to municipalities required to pay heart and hypertension benefits to eligible police officers and firefighters. The plaintiff argues, to the contrary, that the board properly applied the 2010 version of § 7-433c, which contains a conclusive presumption. We agree with the plaintiff.

The threshold question of whether the 1993 version or the 2010 version of § 7-433c applies to the plaintiff's claim for heart and hypertension benefits presents a

question of statutory interpretation. "When construing a statute, our fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . [Pursuant to] General Statutes § 1-2z, [t]he meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. The test to determine ambiguity is whether the statute, when read in context, is susceptible to more than one reasonable interpretation. . . .

"[S]tatutes must be construed, if possible, such that no clause, sentence or word shall be superfluous, void or insignificant . . . . When a statute is not plain and unambiguous, we also look for interpretative guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Richard P.*, 179 Conn. App. 676, 684, 181 A.3d 107, cert. denied, 328 Conn. 924, 181 A.3d 567 (2018).

We begin our analysis with a discussion of the relevant statutory language of the 1993 and 2010 versions of § 7-433c. In 1992, the General Assembly amended § 7-433c by virtue of the passage of No. 92-81 of the 1992 Public Acts (P.A. 92-81). The language of P.A. 92-81 was codified in the 1993 revision of § 7-433c. Public Act 92-81 provides: "Section 1. Section 7-433c of the general statutes is repealed and the following is substituted in lieu thereof:

"(a) In recognition of the peculiar problems of uniformed members of paid fire departments and regular members of paid police departments, and in recognition of the unusual risks attendant upon these occupations, including an unusual high degree of susceptibility to heart disease and hypertension, and in recognition that the enactment of a statute which protects such fire department and police department members against economic loss resulting from disability or death caused by hypertension or heart disease would act as an inducement in attracting and securing persons for such employment, and in recognition, that the public interest and welfare will be promoted by providing such protection for such fire department and police department members, municipal employers shall provide compensation as follows: Notwithstanding any provision of

chapter 568 or any other general statute, charter, special act or ordinance to the contrary, in the event a uniformed member of a paid municipal fire department or a regular member of a paid municipal police department who successfully passed a physical examination on entry into such service, which examination failed to reveal any evidence of hypertension or heart disease, suffers either off duty or on duty any condition or impairment of health caused by hypertension or heart disease resulting in his death or his temporary or permanent, total or partial disability, he or his dependents, as the case may be, shall receive from his municipal employer compensation and medical care in the same amount and the same manner as that provided under chapter 568 if such death or disability was caused by a personal injury which arose out of and in the course of his employment and was suffered in the line of duty and within the scope of his employment, and from the municipal or state retirement system under which he is covered, he or his dependents, as the case may be, shall receive the same retirement or survivor benefits which would be paid under said system if such death or disability was caused by a personal injury which arose out of and in the course of his employment, and was suffered in the line of duty and within the scope of his employment. If successful passage of such a physical examination was, at the time of his employment, required as a condition for such employment, no proof or record of such examination shall be required as evidence in the maintenance of a claim under this section or under such municipal or state retirement systems. The benefits provided by this section shall be in lieu of any other benefits which such policeman or fireman or his dependents may be entitled to receive from his municipal employer under the provisions of chapter 568 or the municipal or state retirement system under which he is covered, except as provided by this section, as a result of any condition or impairment of health caused by hypertension or heart disease resulting in his death or his temporary or permanent, total or partial disability. As used in this section, the term 'municipal employer' shall have the same meaning and shall be defined as said term is defined in section 7-467.

"(b) Notwithstanding the provisions of subsection (a) of this section, any uniformed member of a paid municipal fire department or any regular member of a paid municipal police department who begins such employment on or after July 1, 1992 (1) shall not be eligible for benefits pursuant to this section until such member has completed two years of service from the date of employment and (2) shall not be eligible for benefits pursuant to this section after such member has completed two years of service if the municipal employer proves by a preponderance of evidence that the member's condition or impairment of health caused by hypertension or heart disease is not job related.

"Sec. 2. Section 7-433a of the general statutes is repealed.

"Sec. 3. This act shall take effect July 1, 1992."

We first note that the language set forth in subsection (a) of § 1 of P.A. 92-81 remained unchanged from that of its statutory predecessor, including the preamble thereto, which provided that the benefits required to be paid pursuant to the statute were to serve as an inducement in attracting persons to serve as members of paid fire departments and paid police departments and in recognition of the unique challenges attendant upon those occupations. Public Act 92-81 served to amend § 7-433c significantly, however, by adding subsection (b), which provided that police officers and firefighters *who began their employment on or after July 1, 1992*, would be ineligible to receive benefits pursuant to the statute under two circumstances: (1) until they completed two years of service; and (2) after they completed two years of service if their employer proved by a preponderance of the evidence that their health condition or impairment caused by hypertension or heart disease was not job related. See General Statutes (Rev. to 1993) § 7-433c (b). Thus, the 1993 version of § 7-433c gave municipal employers the opportunity to rebut the statutory presumption, i.e., that a claimant's health condition or impairment caused by hypertension or heart disease was causally connected to his or her employment, which, if successful, would render the claimant ineligible for benefits under the statute.

In 1996, the General Assembly again enacted significant amendments to § 7-433c. Specifically, the General Assembly amended § 7-433c by (1) eliminating the preamble, discussed previously, (2) removing the eligibility restrictions enacted under P.A. 92-81 applicable to police officers and firefighters who began their employment on or after July 1, 1992, (3) eliminating the rebuttable presumption and restoring the conclusive presumption, and (4) adding the provision that a police officer or firefighter *who began his or her employment on or after July 1, 1996*, i.e., the effective date of the act, was not eligible to receive any benefits pursuant to the section.[9] General Statutes (Rev. to 1995) § 7-433c, as amended by Public Acts 1996, No. 96-230, §§ 2 and 3.[10]

We pause to highlight that no other amendments to § 7-433c occurred between 1996 and 2010, and, thus, the rebuttable presumption previously available to municipal employers remained unavailable under the 2010 version of § 7-433c. Accordingly, General Statutes (Rev. to 2009) § 7-433c—the 2010 version of § 7-433c in effect on the date of the plaintiff's injury—provides in relevant part: "(a) Notwithstanding any provision of chapter 568 or any other general statute, charter, special act or ordinance to the contrary, in the event a uniformed member of a paid municipal fire department or

a regular member of a paid municipal police department who successfully passed a physical examination on entry into such service, which examination failed to reveal any evidence of hypertension or heart disease, suffers either off duty or on duty any condition or impairment of health caused by hypertension or heart disease resulting in his death or his temporary or permanent, total or partial disability, he or his dependents, as the case may be, shall receive from his municipal employer compensation and medical care in the same amount and the same manner as that provided under chapter 568 if such death or disability was caused by a personal injury which arose out of and in the course of his employment and was suffered in the line of duty and within the scope of his employment, and from the municipal or state retirement system under which he is covered, he or his dependents, as the case may be, shall receive the same retirement or survivor benefits which would be paid under said system if such death or disability was caused by a personal injury which arose out of and in the course of his employment, and was suffered in the line of duty and within the scope of his employment. . . .

"(b) Notwithstanding the provisions of subsection (a) of this section, those persons who began employment on or after July 1, 1996, shall not be eligible for any benefits pursuant to this section."

We observe at the outset that, by its express terms, the 2010 version of § 7-433c makes clear that the benefits provided by the statute are not available to those persons who began employment *on or after* July 1, 1996. General Statutes (Rev. to 2009) § 7-433c (b). By implication, and in the absence of any other language addressing dates of employment, the statute can only be reasonably read to provide benefits to all otherwise eligible persons who began employment *before* July 1, 1996. That is, the statute contains no language that makes any distinction among persons who began employment prior to July 1, 1996.

The defendant argues that the board erred in applying the 2010 version of § 7-433c, rather than the 1993 version. Notably, the defendant points to no statutory language in the 2010 version to suggest that it does not provide protection to an individual, like the plaintiff, who began his or her employment prior to July 1, 1996. Rather, the defendant relies exclusively on the legislative purpose underlying the adoption of P.A. 92-81, which was to provide municipalities with financial relief by replacing a conclusive presumption of causation with a rebuttable presumption. In doing so, the defendant cites no maxim of statutory interpretation or any other authority for the proposition that, in the absence of statutory language permitting such an exercise, this court can disregard the language of a statute in order to advance the legislative purpose of repealed legisla-

tion. We find such a novel proposition to be without merit. *Bakelaar* v. *West Haven*, 193 Conn. 59, 69, 475 A.2d 283 (1984) ("[w]here there is no ambiguity in the legislative commandment, this court cannot, in the interest of public policy, engraft amendments onto the statutory language" [internal quotation marks omitted]).

Even if the 2010 version of § 7-433c could be deemed ambiguous as to the legislature's intended treatment of those persons who began employment prior to July 1, 1996, and the opportunity for municipal employers to rebut the presumption in the context of claims made by such claimants, the relevant legislative history supports this court's conclusion that the 1993 version does not apply to the plaintiff's claim. That is, the legislative history underlying the General Assembly's replacement of the rebuttable presumption with a conclusive presumption in 1996 reveals that the General Assembly intended for *all* police officers and firefighters hired prior to July 1, 1996, to be "grandfathered in," in an effort to balance the financial concerns of municipalities with the expectations of those police officers and firefighters already employed. See 39 S. Proc., Pt. 8, 1996 Sess., pp. 2570–71, remarks of Senator Louis C. DeLuca;[11] see also id., pp. 2579–81, remarks of Senator John A. Kissel.[12] The legislative history is silent as to any legislative intent to have P.A. 92-81 apply to those police officers or firefighters who were hired on or after July 1, 1992, but prior to July 1, 1996.

Finally, we note that the application of the 2010 version of § 7-433c to the plaintiff's claim is consistent with the common-law date of injury rule. Since 1916, Connecticut courts have looked to the statute in effect on the date on which the claimant suffered his or her injury to determine the substantive rights and obligations that exist between the parties in workers' compensation cases. See, e.g., *Civardi* v. *Norwich*, 231 Conn. 287, 293 n.8, 649 A.2d 523 (1994) ("[the date of injury] rule dates back to 1916 and has been applied consistently to all nonprocedural aspects of a case"); see also *Schmidt* v. *O. K. Baking Co.*, 90 Conn. 217, 220, 96 A. 963 (1916) (applying version of statute in effect at time claimant suffered injury). Notably, the date of injury rule provides that "new workers' compensation legislation affecting rights and obligations as between the parties, and not specifying otherwise, applie[s] only to those persons who received injuries after the legislation became effective, and not to those injured previously." *Iacomacci* v. *Trumbull*, 209 Conn. 219, 222, 550 A.2d 640 (1988). Because the present appeal does not involve whether certain legislation should be applied prospectively versus retroactively, the cases on which the defendant cursorily relies in arguing that we should reject the application of the date of injury rule—*Hall* v. *Gilbert & Bennett Mfg. Co.*, 241 Conn. 282, 695 A.2d 1051 (1997), *Gil* v. *Courthouse One*, 239 Conn. 676, 687

A.2d 146 (1997), and *Rice* v. *Vermilyn Brown, Inc.*, 232 Conn. 780, 657 A.2d 616 (1995)—are inapposite. In *Hall* and *Gil*, our Supreme Court considered the applicability of legislation that went into effect *after* the claimant was injured. *Hall* v. *Gilbert & Bennett Mfg. Co.*, supra, 284–86, 301–306; *Gil* v. *Courthouse One*, supra, 677–78, 685–87. In *Rice*, our Supreme Court concluded that "the date of injury rule has no applicability when the claimant's rights have already expired under the terms of the act that governed the employment relationship." *Rice* v. *Vermilyn Brown, Inc.*, supra, 788. Neither scenario applies in the present case. Here, the defendant's claim on appeal requires this court to choose between two sets of amendments to § 7-433c, both of which went into effect *before* the plaintiff's date of injury. Accordingly, while the date of injury rule does little to illuminate our analysis, we note that our conclusion is consistent with its application.

In sum, we conclude that the board properly applied the 2010 version of § 7-433c to the plaintiff's claim.

II

The defendant next claims that the board erred as a matter of law by affirming the commissioner's finding that the plaintiff's giant cell myocarditis constitutes heart disease under § 7-433c. Specifically, the defendant argues that, regardless of which version of § 7-433c applies to the plaintiff's claim, it presented evidence to the commissioner establishing that giant cell myocarditis is not heart disease but, rather, is a systemic autoimmune disease involving an agent produced by the body outside of the heart. The plaintiff argues, to the contrary, that there is sufficient evidence in the record to support the commissioner's finding that the plaintiff's giant cell myocarditis constitutes heart disease under § 7-433c. We agree with the plaintiff.

We begin by setting forth the commissioner's findings and the procedural history relevant to the defendant's claim. During formal hearings, prior to issuing the August 14, 2013 finding and award, the commissioner heard testimony from two expert witnesses and admitted into evidence multiple exhibits, including various scientific articles concerning giant cell myocarditis. Dr. Wencker, who was serving as the director of the Center for Advanced Heart Failure and Transplant at Hartford Hospital, testified on behalf of the plaintiff. Martin Krauthamer, a consulting cardiologist and former chief of cardiology at Norwalk Hospital, testified on behalf of the defendant.

Dr. Wencker testified that giant cell myocarditis is a rare disease of inflammation of the heart. As far as he knows, it is not possible for giant cell myocarditis to spread to the heart from another part of the body, and a patient with giant cell myocarditis who dies, dies from heart failure, not from any other cause. The treatment

of choice for giant cell myocarditis is a heart transplant. If a patient has a disease involving multiple organs, such as sarcoidosis, he or she would not be a candidate for a heart transplant. During a heart transplant procedure, the old, native heart is not completely removed, and there remains a small portion of the old heart to which the new heart is attached. After a heart transplant, all patients are given immunosuppressive therapy because a foreign body has been implanted, which stimulates autoimmune processes and could lead to the rejection of the heart. With respect to the plaintiff's treatment and diagnosis, Dr. Wencker testified, among other things, that the plaintiff's treatment team harvested a specimen from his heart and determined that it showed evidence of giant cell myocarditis. They did not find any evidence of autoimmune disease or any other diseases or medical conditions, the lack of which finding supported the plaintiff's diagnosis of "a primary cardiac condition that [was] explained by giant cell myocarditis . . . ." Knowing that the plaintiff had giant cell myocarditis and had failed to respond to prednisone, i.e., immunosuppressive therapy, the plaintiff's treatment team inserted the intra-aortic pump into the plaintiff's heart to keep him alive. The plaintiff underwent a heart transplant, and he has not subsequently experienced a recurrence of giant cell myocarditis.

In contrast, Dr. Krauthamer testified that giant cell myocarditis is a disease of the immune system that is mediated by CD4 T cells, which attack the heart. According to Dr. Krauthamer, in some cases, immunosuppressive therapy is effective in suppressing the development of giant cell myocarditis, which means that the disease must be one of the immune system. Additionally, Dr. Krauthamer testified that there is a body of medical literature showing that approximately 20 percent of patients with giant cell myocarditis have giant cells and/or granulomas in other organs in addition to those located in the heart, which suggests to him that giant cell myocarditis is an autoimmune disease affecting the heart and other organs. Moreover, according to Dr. Krauthamer, the fact that, after undergoing successful heart transplant surgery, patients with giant cell myocarditis have a 20 to 25 percent chance of developing the disease in the transplanted heart is "evidence that the immune system is still attacking the heart, and that this is not heart disease but a disease of the immune system, in that the immune system is still seeing heart cells or some substance in the heart as a pathogen and attacking it."

On August 14, 2013, in consideration of the record before him, the commissioner rendered his initial finding and award, finding the testimony of Dr. Wencker to be more persuasive than that of Dr. Krauthamer on the subject of giant cell myocarditis. On December 3, 2015, on remand from the board, and in consideration of the same testimony and evidence, the commissioner

expressly stated that Dr. Wencker's opinion should be accorded "great weight" and that he was "credible and persuasive" on the subject of giant cell myocarditis. Additionally, the commissioner found that sarcoidosis is different from giant cell myocarditis in that sarcoidosis affects several organs, while giant cell myocarditis is a disease "solely of the heart . . . ."

We conclude that there is support in the record for the commissioner's December 3, 2015 finding that the plaintiff's giant cell myocarditis is heart disease. Despite Dr. Krauthamer's contrasting opinions, the commissioner chose to credit heavily Dr. Wencker's testimony, which supports the commissioner's finding that the plaintiff's giant cell myocarditis is heart disease under § 7-433c. We do not disturb that determination on appeal.

In support of its argument that giant cell myocarditis is not heart disease, the defendant relies on *Estate of Brooks* v. *West Hartford*, No. 4907, CRB 6-05-1, 2006 WL 658887 (January 24, 2006), in which the board affirmed the commissioner's finding that the claimant's sarcoidosis was not heart disease. Id., *3. In so concluding, the board stated: "We recognize that there is an element of 'line-drawing' that must take place in defining heart disease. The body is a holistic machine, involving many interdependent parts. Yet, the ingestion of poison, the metastasizing of cancer, or the sudden impact of a bullet or a knife may all cause the heart to stop functioning by the introduction of an external agent, in contrast to coronary artery disease and vascular disease, which affect the structure of the heart itself. Sarcoidosis . . . clearly involves the element of an outside agent (tissue granules), even though that agent is one produced by the body itself." Id.

The defendant's reliance on the evidentiary record and findings in *Estate of Brooks* is misplaced. In the present case, the commissioner found that Dr. Wencker credibly distinguished giant cell myocarditis from sarcoidosis. Dr. Wencker testified that, unlike giant cell myocarditis, sarcoidosis is a systemic disease and presents as granulomatous disease or scar tissue that forms in the lungs or other organs, which leads to the destruction of cells. He testified that sarcoidosis granulomas are not confined to the heart; rather, they can be seen in the lungs, liver, or other organs, whereas giant cell myocarditis is "[found] nowhere [other] than in the heart . . . ." He testified that he has not heard of a case where granulomatous disease is found with giant cell myocarditis. Furthermore, although Dr. Wencker testified that there is evidence that giant cell myocarditis is an autoimmune disease because T cells seem to play a significant role in developing the disease, he testified that giant cell myocarditis due to autoimmune disease is believed to be "reacted against the heart, exclusively the heart." Moreover, he testified that "an

autoimmune process does not need to be systemic," and one cannot conclude that giant cell myocarditis is not a primary disease of the heart simply because an autoimmune process may be present. It was within the commissioner's purview to credit this testimony as he did.

In sum, because there is support in the record for the commissioner's finding that the plaintiff's giant cell myocarditis is heart disease under § 7-433c, we leave that finding undisturbed.

The decision of the Compensation Review Board is affirmed.

In this opinion the other judges concurred.

* The listing of judges reflects their seniority status on this court as of the date of oral argument.

[1] PMA Management Corporation of New England, Inc. (PMA Management), the workers' compensation liability insurer for the named defendant, was also a defendant in the plaintiff's case before the Workers' Compensation Commissioner for the Third District and the Compensation Review Board. PMA Management is not participating in this appeal, however. We refer, therefore, to the city of Milford as the defendant in this opinion.

[2] The plaintiff filed a cross appeal from the board's denial of his motion to dismiss the defendant's appeal from the commissioner's December 3, 2015 finding and award. See footnote 8 of this opinion. The plaintiff did not address this claim in his brief to this court, however, and expressly abandoned his cross appeal during oral argument. We, therefore, have no occasion to review this claim.

[3] General Statutes (Rev. to 2009) § 7-433c was in effect on the date of the plaintiff's injury. For convenience, our references to the 2010 version are to that revision of the statute. The parties' principal dispute involves the applicability of statutory amendments to § 7-433c that went into effect in 1996. As we explain in part I of this opinion, those amendments are codified in the 2009 revision of the statute, which was in effect in 2010. Because the parties have generally adhered to the usage of the phrase "2010 version," we do the same throughout this opinion.

[4] General Statutes (Rev. to 1993) § 7-433c was in effect on the date of the plaintiff's hire on February 12, 1993. For convenience, our references to the 1993 version are to that revision of the statute. Although the parties, the commissioner, and the board referred to the 1992 version of § 7-433c, the 1993 revision, which codified certain 1992 amendments to the statute, was in effect on the date of the plaintiff's hire, and, therefore, we refer to the 1993 version in this opinion.

[5] Additionally, the defendant claims that the board erred as a matter of law by concluding that the defendant failed to rebut the presumption afforded by the 1993 version of § 7-433c, i.e., the presumption that a causal relationship exists between the claimant's alleged health condition or impairment caused by hypertension or heart disease and the claimant's employment. See *Malchik* v. *Division of Criminal Justice*, 266 Conn. 728, 740, 835 A.2d 940 (2003). We need not address this claim, however, because we conclude that the 2010 version of § 7-433c, which contains a conclusive presumption, applies in the present case.

[6] The parties originally stipulated that the 1993 version of § 7-433c, rather than the 2010 version, applied to the plaintiff's claim.

[7] The August 14, 2013 and December 3, 2015 findings and awards were both issued by Commissioner Jack R. Goldberg.

[8] On December 18, 2015, the plaintiff filed a motion to dismiss the defendant's appeal on the ground that it was untimely because the defendant failed to appeal from the board's September 16, 2014 decision, arguing that the commissioner's December 3, 2015 finding and award was not a final, appealable decision but, rather, was a "ministerial act." On January 4, 2016, the defendant filed an objection to the motion to dismiss. On April 21, 2017, the board denied the plaintiff's motion to dismiss, concluding that the December 3, 2015 finding and award was not a "ministerial act" because the commissioner "evaluated the relative merits of the evidence presented in reaching his conclusions," which "required deliberation on his part . . . ."

[9] See Public Acts 1996, No. 96-231, § 1 (providing in part that "only those

persons employed *on the effective date of this act* shall be eligible for any benefits provided by this section" [emphasis added]); Public Acts 1996, No. 96-230, § 2 (adopted on same day as No. 96-231, § 1, of the 1996 Public Acts, to correct error therein, thereby providing in part that "those persons who began employment *on or after the effective date of this act* shall not be eligible for any benefits pursuant to this section" [emphasis added]).

[10] General Statutes (Rev. to 1995) § 7-433c, as amended by Public Acts 1996, No. 96-230, §§ 2 and 3, provides in relevant part: "(a) Notwithstanding any provision of chapter 568 or any other general statute, charter, special act or ordinance to the contrary, in the event a uniformed member of a paid municipal fire department or a regular member of a paid municipal police department who successfully passed a physical examination on entry into such service, which examination failed to reveal any evidence of hypertension or heart disease, suffers either off duty or on duty any condition or impairment of health caused by hypertension or heart disease resulting in his death or his temporary or permanent, total or partial disability, he or his dependents, as the case may be, shall receive from his municipal employer compensation and medical care in the same amount and the same manner as that provided under chapter 568 if such death or disability was caused by a personal injury which arose out of and in the course of his employment and was suffered in the line of duty and within the scope of his employment, and from the municipal or state retirement system under which he is covered, he or his dependents, as the case may be, shall receive the same retirement or survivor benefits which would be paid under said system if such death or disability was caused by a personal injury which arose out of and in the course of his employment, and was suffered in the line of duty and within the scope of his employment. . . .

"(b) Notwithstanding the provisions of subsection (a) of this section, those persons who began employment on or after July 1, 1996, shall not be eligible for any benefits pursuant to this section."

[11] During debate on the Senate floor, Senator DeLuca remarked in pertinent part: "This amendment would become the bill if it were to pass. *This is the so-called grandfather bill* on heart and hypertension whereby all new hires after July 1, 1996 would not be under the heart and hypertension law, but *all those now currently employed as paid firemen, police in the [s]tate of Connecticut in municipal departments, would still be under the heart and hypertension law.*

"So therefore, *it would not take anything away from existing police and firemen,* but anyone who was hired after July 1st would know that they would not be under such law because it would be discontinued for any new hires, so *we would not be taking anything away from anyone,* but we would also be under the understanding that anyone being hired would know that they would not be under that." (Emphasis added.) 39 S. Proc., supra, pp. 2570–71.

[12] During debate on the Senate floor, Senator Kissel stated in relevant part: "[I]t is fundamentally fair to the firefighters and the police officers that are serving our municipalities and our cities at this time. . . . I feel that it is far better to establish grandfathering in a bright line test that says, you know what the rules of the game are going to be if you get hired after this date." 39 S. Proc., supra, pp. 2580–81.