******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# BARBARA ORZECH *v.* GIACCO OIL COMPANY ET AL.
## (AC 43941)

Alvord, Moll and Norcott, Js.

*Syllabus*

The defendant employer, G Co., and its insurer appealed to this court from the decision of the Compensation Review Board affirming the Workers' Compensation Commissioner's award of survivorship benefits to the plaintiff. The plaintiff's deceased spouse, S, who had been an employee of G Co., slipped and fell while delivering oil to one of its customers. The fall aggravated S's existing knee injury to such an extent that he could no longer work or carry out his daily activities. S's physician recommended knee replacement surgery, however, S's health insurance had been canceled thirty days after the incident and he could not afford the procedure. S filed a workers' compensation claim relating to the compensability of the knee replacement surgery. Prior to the conclusion of the formal hearings before the commissioner, S died. Thereafter, the plaintiff filed a claim for survivorship benefits. Following the testimony of both expert and lay witnesses, the commissioner determined that S had died by suicide as a result of depression that stemmed from compensable work injuries and that the plaintiff was entitled to survivorship benefits. The defendants filed a petition for review of the commissioner's finding and award with the board, claiming that, inter alia, in accordance with *Sapko* v. *State* (305 Conn. 360), S's consumption of an excessive amount of alcohol and medication prior to his death constituted a superseding cause that broke the chain of causation between the work incident and S's death. The board disagreed and affirmed the commissioner's finding and award, and the defendants appealed to this court. *Held* that the board properly affirmed the commissioner's award of survivorship benefits to the plaintiff: the commissioner's subordinate findings that the decedent developed depression following the work incident, that his compensable injuries were a substantial contributing factor to his development of depression, that the manner of his death was a suicide, and that his suicide stemmed from his depression, were reasonable and grounded in the evidence produced during the proceedings before the commissioner; moreover, the commissioner's finding that a chain of causation existed linking the decedent's compensable injuries to his death was supported by the record and was not the misapplication of law, as, unlike in *Sapko*, which involved a death resulting from an accidental overdose, in the present case, the decedent's manner of death, a suicide from acute intoxication, was an act not untethered to his compensable injuries or the depression that he thereafter developed.

Argued April 13—officially released October 19, 2021

*Procedural History*

Appeal from the decision of the Workers' Compensation Commissioner for the Eighth District finding that the plaintiff's decedent had sustained certain compensable injuries and awarding survivorship benefits, brought to the Compensation Review Board, which affirmed the commissioner's decision, and the defendants appealed to this court. *Affirmed.*

*Nicholas C. Varunes*, for the appellants (defendants).

*Andrew E. Wallace*, for the appellee (plaintiff).

*Opinion*

MOLL, J. In this workers' compensation matter, the defendant employer, Giacco Oil Company (Giacco), and its insurer, Federated Mutual Insurance Company, appeal from the decision of the Compensation Review Board (board) affirming the finding and award of the Workers' Compensation Commissioner for the Eighth District (commissioner) of the Workers' Compensation Commission (commission) awarding survivorship benefits under General Statutes § 31-306[1] to the plaintiff, Barbara Orzech, the surviving spouse of the deceased employee, Stanley Orzech (decedent). In awarding survivorship benefits to the plaintiff, the commissioner found that the decedent had died by suicide as a result of depression that he had developed stemming from compensable work injuries. On appeal, the defendants claim that the board improperly affirmed the commissioner's award of survivorship benefits to the plaintiff because the commissioner erred in finding a causal link between the decedent's compensable injuries and his death when (1) subordinate facts found by the commissioner were speculative or inconsistent with the evidence and (2) the record established that the decedent engaged in conduct prior to his death that constituted a superseding cause breaking the chain of causation between his compensable injuries and his death. We disagree and, accordingly, affirm the decision of the board.

The following facts, as found by the commissioner or as undisputed in the record, and procedural history are relevant to our resolution of this appeal. The decedent began working for Giacco in 1994, delivering oil and performing other related services. On November 1, 2016, while delivering oil to a customer's home, the decedent slipped and fell, sustaining injuries to his back, right shoulder, and knees (work incident). Prior to the work incident, the decedent received periodic medical treatment to alleviate his "long-standing knee problems . . . ." The decedent and his treating physician frequently discussed the likelihood that the decedent would need a total replacement of his right knee, but, before the work incident, the knee replacement surgery "was always 'down the road.' . . ." Following the work incident, the decedent's right knee pain became "unbearable," and he wished to proceed with the knee replacement surgery; however, the decedent's health insurance was canceled thirty days after the work incident, and he could not afford to proceed with the surgery.

The decedent filed a workers' compensation claim in relation to the work incident. The defendants did not deny that the work incident had occurred, but they did deny the extent of the decedent's injuries. In particular, the defendants repudiated that the work incident was a substantial contributing factor in the decedent's need for knee replacement surgery. On June 15, 2017, the

commissioner held a formal hearing on the compensability of the knee replacement surgery, during which the decedent testified. At the conclusion of the hearing, the commissioner left the record open and scheduled another formal hearing for August 18, 2017.

On July 22, 2017, the plaintiff and the decedent attended a family gathering and, thereafter, went to a bar for drinks before returning home. According to the plaintiff, the decedent drank two beers at the family gathering and consumed approximately four beers and four shots of alcohol at the bar. On July 23, 2017, the plaintiff found the decedent dead in their home. Maura DeJoseph, a pathologist in the Office of the Chief Medical Examiner (OCME), determined that the cause of the decedent's death was "acute intoxication due to the combined effects of alcohol, eszopiclone [also known as Lunesta], lorazepam [also known as Ativan], sertraline [also known as Zoloft] and diphenhydramine [also known as Benadryl]," and that the manner of the decedent's death was a suicide. Thereafter, the plaintiff filed a claim for survivorship benefits. The commissioner held several formal hearings on the plaintiff's claim between February 8 and August 21, 2018. The commissioner heard testimony from multiple lay witnesses, including the plaintiff, and from expert witnesses. Additionally, several exhibits were admitted into evidence, including the decedent's medical records, a police report, and reports prepared by the OCME.

In her brief submitted to the commission, the plaintiff asserted that the decedent died by suicide as a result of depression that he had developed because of his compensable injuries. In their brief submitted to the commission, the defendants argued that the evidence did not support findings that the decedent became depressed following the work incident and died by suicide. In addition, the defendants argued that, prior to his death, the decedent "intentionally imbibed an excessive amount of alcohol" and then overdosed on a myriad of medications, notwithstanding the decedent knowing that mixing alcohol with his medications was contraindicated. Analogizing this case to *Sapko* v. *State*, 305 Conn. 360, 44 A.3d 827 (2012), the defendants argued that the decedent's consumption of alcohol and the medications was a superseding cause that broke the chain of causation between the work incident and the decedent's death.

On December 24, 2018, the commissioner issued a finding and award ordering the defendants (1) "to accept the November 1, 2016 need for right total knee replacement as compensable and to pay benefits associated with this finding"[2] and (2) to pay survivorship benefits to the plaintiff in accordance with § 31-306, along with other benefits provided under the statute. The commissioner found in relevant part that (1) the decedent became depressed following the work inci-

dent, (2) the decedent's compensable injuries were a substantial contributing factor in causing the decedent's depression, and (3) as a result of his depression, the decedent intended to cause his own death and died by suicide. On January 22, 2019, Giacco filed motions to correct and for articulation. On January 28, 2019, the commissioner granted three of Giacco's requested corrections, which are inconsequential to this appeal, but denied the remainder of Giacco's motion to correct. On the same day, the commissioner denied Giacco's motion for articulation in its entirety.

The defendants subsequently filed a petition for review of the commissioner's finding and award. In their brief submitted to the board, the defendants argued that the commissioner's findings that the decedent became depressed following the work incident and that the manner of his death was a suicide were not supported by the evidence or were based on conjecture. In addition, they argued that the commissioner minimized the effect of the decedent's consumption of alcohol on his death. Relying on *Sapko*, the defendants maintained that the decedent's consumption of an excessive amount of alcohol and an excessive quantity of medications prior to his death constituted a superseding cause breaking the causal link between the decedent's compensable injuries and his death. In her brief submitted to the board, the plaintiff argued that the commissioner's findings were supported by the record and that the commissioner properly applied the law to the facts he found.

On January 30, 2020, the board issued a decision affirming the commissioner's finding and award. The board concluded that the record contained evidence, credited by the commissioner, "creating a chain of causation" linking the decedent's compensable injuries to his death. The board determined that there was evidence, including testimony by the plaintiff's expert witness, demonstrating that the decedent had died by suicide, and that the commissioner was not obligated to credit evidence to the contrary. The board further determined that the commissioner was not required to credit evidence that militated against his finding that the decedent had developed depression. As to the defendants' argument that the commissioner did not adequately consider the effect of the decedent's consumption of alcohol on his death, the board determined that "it was reasonable for the commissioner to discount the theory that this was a death by misadventure due to the abuse of alcohol as the evidence clearly supports his conclusion that the decedent had wilfully 'ingested a shockingly high number of pills.' " This appeal followed. Additional facts will be set forth as necessary.

We first set forth the standard of review and legal principles applicable to the defendants' claims. "[T]he principles [governing] our standard of review in workers' compensation appeals are well established. . . .

The board sits as an appellate tribunal reviewing the decision of the commissioner. . . . [T]he review . . . of an appeal from the commissioner is not a de novo hearing of the facts. . . . [Rather, the] power and duty of determining the facts rests on the commissioner [and] . . . [t]he commissioner is the sole arbiter of the weight of the evidence and the credibility of witnesses . . . . Where the subordinate facts allow for diverse inferences, the commissioner's selection of the inference to be drawn must stand unless it is based on an incorrect application of the law to the subordinate facts or from an inference illegally or unreasonably drawn from them." (Internal quotation marks omitted.) *Vitti* v. *Milford*, 190 Conn. App. 398, 405, 210 A.3d 567, cert. denied, 333 Conn. 902, 214 A.3d 870 (2019). "It matters not that the basic facts from which the [commissioner] draws this inference are undisputed rather than controverted. . . . It is likewise immaterial that the facts permit the drawing of diverse inferences. The [commissioner] alone is charged with the duty of initially selecting the inference [that] seems most reasonable and [the commissioner's] choice, if otherwise sustainable, may not be disturbed by a reviewing court." (Internal quotation marks omitted.) *Sapko* v. *State*, supra, 305 Conn. 371. "This court's review of [the board's] decisions . . . is similarly limited. . . . [W]e must interpret [the commissioner's finding] with the goal of sustaining that conclusion in light of all of the other supporting evidence. . . . Once the commissioner makes a factual finding, [we are] bound by that finding if there is evidence in the record to support it." (Internal quotation marks omitted.) *Vitti* v. *Milford*, supra, 405.

"Furthermore, [i]t is well settled that, because the purpose of the [Workers' Compensation Act (act), General Statutes § 31-275 et seq.] is to compensate employees for injuries without fault by imposing a form of strict liability on employers, to recover for an injury under the act a plaintiff must prove that the injury is causally connected to the employment. To establish a causal connection, a plaintiff must demonstrate that the claimed injury (1) arose out of the employment, and (2) [arose] in the course of the employment. . . .

"[I]n Connecticut traditional concepts of proximate cause constitute the rule for determining . . . causation [in workers' compensation cases]. . . . [T]he test of proximate cause is whether the [employer's] conduct is a substantial factor in bringing about the [employee's] injuries. . . . Further, it is the plaintiff who bears the burden to prove an unbroken sequence of events that tied [the employee's] injuries to the [employer's conduct]. . . . The existence of the proximate cause of an injury is determined by looking from the injury to the negligent act complained of for the necessary causal connection. . . .

"As [our Supreme Court] previously [has] indicated,

[the] court has defined proximate cause as [a]n actual cause that is a substantial factor in the resulting harm . . . . Because actual causation, in theory, is virtually limitless, the legal construct of proximate cause serves to establish how far down the causal continuum tortfeasors will be held liable for the consequences of their actions. . . . The fundamental inquiry of proximate cause is whether the harm that occurred was within the scope of foreseeable risk created by the defendant's negligent conduct. . . . The question of proximate causation . . . belongs to the trier of fact because causation is essentially a factual issue. . . . It becomes a conclusion of law only when the mind of a fair and reasonable [person] could reach only one conclusion; if there is room for a reasonable disagreement the question is one to be determined by the trier as a matter of fact." (Citations omitted; internal quotation marks omitted.) *Sapko* v. *State*, supra, 305 Conn. 371–73.

This appeal does not concern the compensability of the primary injuries sustained by the decedent as a result of the work incident; see footnote 2 of this opinion; rather, the crux of the appeal is the compensability of a subsequent injury, that being the decedent's death. In *Sapko* v. *State*, supra, 305 Conn. 360, our Supreme Court expressly adopted the "direct and natural consequence rule" for subsequent injury cases. Id., 383–85. In *Sapko*, our Supreme Court concluded that a workers' compensation commissioner had "properly applied the superseding cause doctrine in finding that [an employee's] compensable work injuries were not the proximate cause of his death." Id., 371. As our Supreme Court explained: "The commissioner's application of the superseding cause doctrine is in accord with the approach advocated by Professor Arthur Larson for determining causation when an employee, having suffered a compensable primary injury during the course of his employment, later sustains a second injury outside the course of employment for which the employee seeks compensation, claiming that the second injury relates back to the primary injury in a sufficiently direct way. Professor Larson explains: 'A distinction must be observed between causation rules affecting the primary injury . . . and causation rules that determine how far the range of compensable consequences is carried, once the primary injury is causally connected with the employment. As to the primary injury, it has been shown that the "arising" test is a unique one quite unrelated to common-law concepts of legal cause, and . . . the employee's own contributory negligence is ordinarily not an intervening cause preventing initial compensability. But when the question is whether compensability should be extended to a subsequent injury or aggravation related in some way to the primary injury, the rules that come into play are essentially based [on] the concepts of "direct and natural results," and of [the employee's] own conduct as an independent interven-

ing cause.' . . . 'The basic rule is that a subsequent injury, whether an aggravation of the original injury or a new and distinct injury, is compensable if it is the direct and natural result of a compensable primary injury.' . . . Professor Larson further explains that, when a subsequent injury or aggravation of the primary injury arises out of what he describes as a 'quasi-course' of employment activity, such as a trip to the doctor's office for treatment of the primary injury, 'the chain of causation should not be deemed broken by mere negligence in the performance of that activity . . . but only by intentional conduct which may be regarded as expressly or impliedly forbidden by the employer.' . . . Consequently, all the medical consequences and sequelae that flow from the primary injury are compensable. . . .

" 'When, however, the injury following the initial compensable injury does not arise out of a quasi-course activity, as when [an employee] with an injured hand engages in a boxing match, the chain of causation may be deemed [to be] broken by either intentional or negligent [employee] misconduct.' . . . Thus, Professor Larson explains that 'compensability can be defeated by a certain degree of employee misconduct, and . . . that degree is something beyond simple negligence, and can best be described as an intentional violation of an express or implied prohibition in the matter of performing the act.' " (Citations omitted; footnotes omitted.) Id., 378–81. Observing that our appellate courts and courts in other jurisdictions had utilized the direct and natural consequence rule, the court stated that "the rule provides the best framework for analyzing the element of proximate cause in cases involving a subsequent injury or an aggravation of an earlier, primary injury." Id., 385.

Moreover, the court stated that "[d]ecisions in these sorts of cases are necessarily fact driven . . . ." (Internal quotation marks omitted.) Id.; see 1 L. Larson & T. Robinson, Larson's Workers' Compensation Law (2019) § 10.04, p. 10-13. "[T]herefore, results will vary depending on the case. Consequently, whether a sufficient causal jconnection exists between the employment and a subsequent injury is, in the last analysis, a question of fact for the commissioner. It is axiomatic that, in reaching that determination, the commissioner often is required to draw an inference from what [the commissioner] has found to be the basic facts. [As we previously have explained] [t]he propriety of that inference . . . is vital to the validity of the order subsequently entered. But the scope of judicial review of that inference is sharply limited . . . . If supported by evidence and not inconsistent with the law, the . . . [c]ommissioner's inference that an injury did or did not arise out of and in the course of employment is conclusive. No reviewing court can then set aside that inference because the opposite one is thought to be more reasonable; nor

can the opposite inference be substituted by the court because of a belief that the one chosen by the . . . [c]ommissioner is factually questionable. . . . Only if no reasonable fact finder could have resolved the proximate cause issue as the commissioner resolved it will the commissioner's decision be reversed by a reviewing court." (Citation omitted; internal quotation marks omitted.) *Sapko* v. *State*, supra, 305 Conn. 385–86. In addition, "[u]nless causation under the facts is a matter of common knowledge, the plaintiff has the burden of introducing expert testimony to establish a causal link between the compensable workplace injury and the subsequent injury. . . . When . . . it is unclear whether an employee's [subsequent injury] is causally related to a compensable injury, it is necessary to rely on expert medical opinion. . . . Unless the medical testimony by itself establishes a causal relation, or unless it establishes a causal relation when it is considered along with other evidence, the commissioner cannot reasonably conclude that the [subsequent injury] is causally related to the employee's employment." (Citation omitted; internal quotation marks omitted.) *Coughlin* v. *Stamford Fire Dept.*, 334 Conn. 857, 865–66, 224 A.3d 1161 (2020).

With these legal tenets in mind, we turn to the defendants' interrelated claims on appeal, which, taken together, challenge the commissioner's finding, as affirmed by the board, that a chain of causation existed linking the decedent's compensable injuries to his death. First, the defendants claim that the commissioner erred in making several subordinate findings forming the foundation of his finding that the decedent's compensable injuries and his death were causally linked. Second, the defendants claim that the commissioner committed error in failing to find that the decedent's consumption of alcohol and medications prior to his death constituted a superseding cause of his death, thereby defeating compensability for his death. We disagree.

I

We first address the defendants' claim that the board improperly affirmed the commissioner's decision awarding survivorship benefits to the plaintiff because the commissioner erred in making several subordinate findings supporting his finding that a chain of causation existed connecting the decedent's compensable injuries to his death. Specifically, the defendants challenge the commissioner's findings that (1) the decedent developed depression following the work incident, (2) the decedent's compensable injuries were a substantial contributing factor in his development of depression, (3) the manner of the decedent's death was a suicide, and (4) the decedent's suicide stemmed from his depression. We are not persuaded.

The record before the commissioner contained the

following relevant evidence. According to a police report generated in relation to the decedent's death, after being dispatched to the home of the plaintiff and the decedent on July 23, 2017, a police officer discovered the decedent's body in a bedroom, naked and positioned with his feet on the ground and his back flat on the bed. There were "a few small white pills" on the decedent's legs and on the ground near his feet, and there were approximately 20 Ativan pills on the ground. Additionally, there were several medicine bottles located on a small dresser near the decedent, including (1) Ativan, indicating a directed dosage of one pill three times per day, last filled on June 23, 2017, with a quantity of 270 pills, fifty-four of which were found in the bottle, and (2) Lunesta, indicating a directed dosage of one pill nightly, last filled on July 18, 2017, with a quantity of thirty pills, none of which remained in the bottle.[3] The officer spoke at the scene with the plaintiff, who told the officer, inter alia, that the decedent had been injured in November, 2016, that the decedent had "been battling with [workers'] compensation," that the decedent was taking medication for depression, and that she gave the decedent his medication every day "because he [did not] know what to take." The plaintiff further told the officer that she had no inclination that the decedent was contemplating suicide, although, "for the past few months, [the decedent] ha[d] said 'this is no life.' "

In a deposition, DeJoseph testified as follows. DeJoseph's role in the decedent's case was to determine the cause of death and the manner of death. She defined "cause of death" as "the etiologically-specific entity that resulted in the person dying, so what sets into motion all of the metabolic injuries or injuries that resulted in the death . . . ." DeJoseph determined that the cause of the decedent's death was acute intoxication resulting from the effects of alcohol and four medications, namely, Ativan (an antianxiety medication), Lunesta (a sleeping medication), Zoloft (an antidepressant), and Benadryl (an antihistamine). With respect to alcohol, at the time of his death, the decedent had a blood alcohol content of 0.162, which equates to approximately eight alcoholic drinks in one hour. The decedent also had alcohol in his stomach that had not yet been absorbed. DeJoseph could not determine, however, the precise number of alcoholic drinks that the decedent had consumed prior to his death. With respect to Ativan and Lunesta, at the time of his death, the decedent had more than therapeutic levels of those medications in his bloodstream, and several tablets—ten of Ativan and three of Lunesta—remained unabsorbed in his stomach. DeJoseph determined that Ativan and Lunesta were substantial factors causing the decedent's death. In addition, at the time of his death, the decedent had Zoloft and Benadryl in his system, both of which, DeJoseph determined, were contributing factors causing

his death.

DeJoseph classified the decedent's manner of death as a suicide. She defined "manner of death" as "the circumstances under which the death occurred," which must be classified as one of the following: natural, accident, suicide, homicide, undetermined, or therapeutic complication. To classify a death as a suicide, DeJoseph explained that there must be "enough evidence to support that there was intent to end one's own life." In deaths involving intoxication, to establish intent, DeJoseph relies on "pill counts . . . knowing the levels of drug[s] in the [deceased's] body . . . knowing whether or not there are more pills than should be taken represented in the gastric contents . . . information from the [deceased's] family . . . [and] other information regarding [the deceased's] mental health." A deceased's mental health information is obtained from family members and medical reports, including toxicology reports that may reflect the presence of an antidepressant. In classifying the decedent's manner of death as a suicide, DeJoseph determined that the decedent exhibited an intent to take his own life on the basis of (1) the number of pills found in the decedent's stomach, (2) the number of pills unaccounted for and found around the decedent's body, which suggested that he intended to take more pills than those found in his stomach, and (3) DeJoseph's belief that the plaintiff typically controlled the decedent's medications, such that his ingestion of medications unbeknownst to the plaintiff was an unusual circumstance. DeJoseph also noted that a toxicology report indicated the presence of an antidepressant in the decedent's system.[4]

During a formal hearing held on April 3, 2018, the plaintiff testified in relevant part as follows. Prior to the work incident, the decedent was "a happy-go-lucky kind of guy who loved his job" and who, among other things, enjoyed telling jokes, mowed the lawn every day, took out the garbage every Sunday, dusted and organized a collection of miniature lighthouses that he kept, and maintained a koi pond. Following the work incident, "[e]verything" changed. For instance, the decedent experienced increased pain in his back, shoulder, and knees, spent most of his time at home lying in bed or sitting in a chair, used a cane to walk, ascended and descended stairs on his buttocks, and was no longer able to drive or to perform his regular activities, like maintaining the koi pond and mowing the lawn. Additionally, after the decedent's health insurance was canceled following the work incident, receiving medical care became difficult, and the decedent lacked insurance coverage to undergo knee replacement surgery. The decedent conveyed to the plaintiff that " '[t]his is no life.' "

In December, 2016, concerned that the decedent "wasn't acting himself,"[5] the plaintiff scheduled an

appointment for the decedent to meet with Joseph Tomanelli, his primary care physician. According to a medical record, on December 15, 2016, after noting that the decedent had a "depressed mood," Tomanelli prescribed the decedent Zoloft, instructing that he take one fifty milligram tablet daily.

Donald Werner, the plaintiff's brother who lived with the plaintiff and the decedent, testified during a formal hearing held on April 5, 2018, that, prior to the work incident, the decedent was a "lighthearted, outgoing person who cared about the people around him, [who] was always helping people, [and who was] always working around the house . . . ." Werner further testified that, following the work incident, the decedent experienced mobility problems with his back and his knees, "to the point where he would just come downstairs and sit in his chair, and nothing," and the decedent experienced a "[c]ontinued frustration with the process. He really wanted to start getting stuff done. He wanted to go back to work. And . . . it wore on him. It wore him out; and he would be tired all the time." Werner also testified that the decedent stated that he "[did not] know how much longer [he could] do this," although Werner did not interpret that statement to mean that the decedent was contemplating suicide. Additionally, the police report reflected that Werner, who was at home with the plaintiff when she discovered the decedent's body, told the police that the decedent had been experiencing severe pain since the work incident but that the decedent was "happy throughout the entire process and never showed signs that he wanted to hurt himself."

During the April 5, 2018 hearing, Alexa Jamieson, the plaintiff's daughter and the decedent's stepdaughter, testified that, prior to the work incident, the decedent was "fun loving, active, loved doing all his hobbies, like taking care of the house . . . doing random chores around the house . . . [and] was active and in a good mindset." She also testified that, following the work incident, the decedent was "more detached," spent less time socializing with her, spent more time in his bedroom, and "didn't . . . [want] to do anything anymore. The little things that he used to enjoy, he never enjoyed them anymore," including tending to his two dogs. Jamieson further testified that, in discussing his injuries, the decedent conveyed to her that " 'this is no life. How can someone do this?' "

Both parties retained psychiatrists as expert witnesses. Mark Waynik, the plaintiff's expert, prepared a report dated October 31, 2017, opining that, within a reasonable degree of medical probability, the work incident was "a substantial contributing factor in [the decedent's] diagnosis of anxiety and depression, and ultimately his demise." Waynik's opinion was based on his review of the decedent's medical records, the OCME

reports, the police report, the decedent's death certificate, and certain transcripts. Kenneth Selig, the defendants' expert, prepared a report dated December 24, 2017, opining that, within a reasonable degree of medical probability, there was insufficient evidence to conclude whether the decedent intended to die by suicide or whether, if he did die by suicide, the work incident was a substantial contributing factor in his death. Selig wrote, inter alia, that (1) the decedent remained active following the work incident, (2) the materials he reviewed did not suggest that the decedent suffered from severe depression, and (3) the circumstances of the decedent's death could lead to the conclusion that he unintentionally overdosed in an attempt to medicate himself. In preparing his opinion, Selig reviewed various materials, including the decedent's medical records, the OCME reports, the police report, the decedent's death certificate, Waynik's report, and certain transcripts.

During a formal hearing held on June 5, 2018, Waynik testified that, after reviewing additional materials, including Selig's report and transcripts of the formal hearings held in April, 2018, he maintained the opinion that, within a reasonable degree of medical probability, the work incident was a substantial contributing factor in the decedent's development of depression and subsequent suicide. In explaining the basis of his opinion, Waynik testified as follows. Waynik explained that symptoms supporting a diagnosis for depression include a "depressed mood, weepiness, insomnia or hypersomnia, either oversleeping or undersleeping . . . overeating [or] undereating, hopelessness, helplessness, irritability, lack of energy, lack of drive, [and] lack of motivation." According to Waynik, on the basis of his review of the materials provided to him, the decedent exhibited most of these symptoms following the work incident. Prior to the work incident, the decedent was an active person and a "hard worker" who had persevered through prior injuries,[6] but, after the work incident, there was a "dramatic change in his personality and his behavior," as he became "dysfunctional," "weepy," "stoic," "withdrawn," "apathetic," and "anhedonic," remained mostly confined to a chair at home, and suffered from insomnia. The decedent's medical records did not reveal any indication that he suffered from depression prior to the work incident, but, thereafter, Tomanelli prescribed the decedent Zoloft. Waynik linked the decedent's depression to the chronic pain stemming from his compensable injuries, explaining that "it's very common in people who have any kind of chronic illness . . . [to] get depressed after a while. If anything goes on and on and doesn't go away, depression frequently results."

As to the manner of the decedent's death, Waynik testified that the quantity of medication that the decedent ingested, which was in excess of the amount needed for treatment, demonstrated an intent to die,

such that the decedent did not accidentally kill himself. Waynik believed that, as a result of the depression that the decedent had developed, the decedent "didn't see any way out," "felt hopeless and ultimately [died by] suicide." Waynik further testified that, although his conclusion that the decedent died by suicide was partially based on DeJoseph's classification of the decedent's manner of death as a suicide, he would have reached the same conclusion without the benefit of DeJoseph's determinations.

At a formal hearing held on August 21, 2018, Selig testified that he maintained his opinion that, within a reasonable degree of medical probability, there was not enough evidence to establish that the decedent became significantly depressed following the work incident or that, if he did, his death was a suicide stemming from his depression.

In his finding and award, the commissioner found that, following the work incident, the decedent (1) was totally disabled from work and never regained a work capacity before his death, (2) spent most of his time at home confined to his bed or to a chair, (3) had to use his buttocks to ascend and descend stairs, and (4) could no longer drive, tend to his dogs and koi pond, mow the lawn, or walk long distances. The commissioner found that the decedent became depressed "because he could no longer work [and] was no longer physically active. He wanted the knee replacement surgery, but the [defendants were] denying the surgery and he could not afford to have it done, given that his health insurance had been canceled and he did not have the financial resources outside of health insurance." The commissioner further found that the compensable injuries were "a substantial contributing factor in causing [the decedent's] depression" and that, "[a]s a result of his depression, [the decedent] intended to cause his death and did [die by] suicide . . . ." In making his findings, the commissioner expressly credited Waynik's opinion as being "persuasive." In contrast, the commissioner discredited Selig's opinion as "not persuasive because [Selig] believes that it is possible for [the decedent] to have accidentally taken such a high number of pills . . . . [Selig] was also unaware that [the decedent] did not have the option of putting his surgery through a health insurance plan." In affirming the commissioner's decision, the board determined that there was sufficient evidence supporting the commissioner's findings.

The defendants claim that, contrary to the board's determination, the commissioner's subordinate findings are untenable for several reasons. First, the defendants contend that Waynik either overlooked or was not privy to information that undercut his opinion that the decedent developed depression and died by suicide, rendering Waynik's opinion conjectural. In particular, the defendants rely on evidence indicating that the dece-

dent remained hopeful following the work incident, anticipated undergoing surgery, and looked forward to returning to work. We are not persuaded. In cross-examining Waynik during the formal hearing, the defendants' counsel elicited testimony from Waynik that the decedent exhibited signs that he was not "hopeless" following the work incident. On redirect examination, however, Waynik testified that the decedent exhibited many signs of "hopelessness" and that an individual who is depressed can experience both "good days and bad days . . . ." Earlier, during direct examination, Waynik had elucidated that point in testifying that "one [good] day is not as significant as the several months prior to that where [the decedent] showed consistent depression, consistent withdrawal, [and] consistent depressive symptoms." Thus, we disagree with the defendants that Waynik ignored or failed to account for information contradicting his opinion; rather, the record reflects that Waynik maintained his opinion in spite of such information. The commissioner was entitled to credit Waynik's opinion, which was not based on conjecture.

The defendants also contend that the commissioner's finding that the decedent died by suicide is unreasonable because DeJoseph's determination that the manner of the decedent's death was a suicide was based on an erroneous factual predicate. Specifically, during her deposition, DeJoseph testified that one of the factors that she considered in classifying the manner of the decedent's death as a suicide was that the police report reflected that the plaintiff had told the police that she ordinarily controlled the distribution of the decedent's medications. DeJoseph believed that the decedent's consumption of his medications without the plaintiff's knowledge suggested an intent to die by suicide. During the proceedings before the commissioner, however, the plaintiff testified that she occasionally dispensed the decedent's medications to him at his request, but otherwise the decedent took his medications without her help. Thus, the defendants posit, DeJoseph's determination that the manner of the decedent's death was a suicide was unsupported by the facts, and the commissioner's reliance on DeJoseph's determination in finding that the decedent died by suicide was improper. This contention is unavailing. Even assuming that DeJoseph's determination was unreliable because it was based, in part, on incorrect information,[7] Waynik's testimony provided an independent basis supporting the commissioner's finding that the decedent died by suicide. Although Waynik testified that he partially relied on DeJoseph's determination in rendering his opinion, he further testified that he would have reached the same conclusion without having knowledge of DeJoseph's determination. Thus, the defendants' assertion fails.

The defendants' remaining contentions assert that the commissioner's subordinate findings are speculative or

cannot reasonably be drawn from the evidence. We are not persuaded. Mindful of the limited scope of our review, we conclude that the commissioner's subordinate findings—that (1) the decedent developed depression following the work incident, (2) the decedent's compensable injuries were a substantial contributing factor in his development of depression, (3) the manner of the decedent's death was a suicide, and (4) the decedent's suicide stemmed from his depression—are reasonable and grounded in the evidence produced during the proceedings before the commissioner.

II

We next turn to the defendants' claim that the board improperly affirmed the commissioner's award of survivorship benefits to the plaintiff because the commissioner improperly failed to find that the decedent's conduct leading up to his death—his excessive consumption of alcohol and medications—constituted a superseding cause of his death, thus defeating compensability for his death. The defendants assert that the commissioner, as well as the board in affirming the commissioner's decision, ran afoul of the principles set forth by our Supreme Court in *Sapko* v. *State*, supra, 305 Conn. 360, in determining that there was an unbroken chain of causation linking the decedent's compensable injuries to his death. This claim is unavailing.

We begin with an overview of *Sapko*, a workers' compensation matter involving the death of a state correction officer. Id., 365. The cause of the officer's death was "multiple drug toxicity due to the interaction of excessive doses of Oxycodone and Seroquel . . . ." (Internal quotation marks omitted.) Id., 364. The manner of the officer's death, or the "nature of the [officer's] death" as described in *Sapko*, "was an accident and not suicide." (Internal quotation marks omitted.) Id., 365. Leading up to his death, in the course of his employment, the officer "experienced four incidents [that] gave rise to claims for workers' compensation benefits," the latest of which resulted in a compensable back injury. (Internal quotation marks omitted.) Id. The officer was prescribed several medications, including Oxycodone, to treat his back pain. Id. The officer was counseled on the proper use of pain management drugs and was required to participate in a controlled substances agreement. Id. Additionally, prior to sustaining the compensable back injury, the officer was being treated for major depression. Id. One week before his death, to abate symptoms of depression and racing thoughts that the officer was experiencing, the officer's treating psychiatrist prescribed him Seroquel, an antipsychotic medication. Id., 365–66.

Following the officer's death, his spouse sought survivorship benefits. Id., 362. A workers' compensation commissioner denied the spouse's claim, finding that (1) no causal relationship existed between the officer's

compensable injuries and his psychiatric treatment, including his use of Seroquel, and (2) the elevated level of Oxycodone in the officer's system, by itself, did not cause the officer's death, but rather the officer's "ingestion of excessive quantities of Oxycodone and Seroquel, [al]though accidental, constitute[d] a superseding cause of his death." (Internal quotation marks omitted.) Id., 367–68. The commissioner further found that "[the officer's] work injuries . . . were neither a substantial factor nor the proximate cause of [his] death." (Internal quotation marks omitted.) Id., 368. The spouse appealed to the board, which affirmed the commissioner's decision. Id. The board concluded in relevant part that the commissioner had properly applied the superseding cause doctrine, and that "the record supported the commissioner's finding that an outside causal agency, namely, the [officer's] ingestion of excessive quantities of prescribed medication, had intervened and broken the chain of causation between the [officer's] compensable injuries and his death." Id. The spouse appealed to this court, which affirmed the board's decision. *Sapko* v. *State*, 123 Conn. App. 18, 21, 1 A.3d 250 (2010), aff'd, 305 Conn. 360, 44 A.3d 827 (2012).

After granting certiorari, our Supreme Court affirmed this court's decision, albeit on different grounds.[8] *Sapko* v. *State*, supra, 305 Conn. 364. The court concluded that the board properly upheld the commissioner's finding "on the issue of proximate cause, in particular, his determination that the [officer's] ingestion of excessive quantities of Oxycodone and Seroquel constituted an intervening event that broke the chain of causation" linking the officer's compensable injuries to his death. Id., 386. The court determined that (1) there was expert testimony, credited by the commissioner, that the level of Oxycodone in the officer's system was twenty times higher than the therapeutic dosage, but the Oxycodone likely would not have been fatal in the absence of the officer's simultaneous overdose on Seroquel, (2) there was evidence supporting the commissioner's finding that the officer's treatment with Oxycodone was unrelated to his treatment with Seroquel and that the two drugs could be ingested together safely, and (3) there was evidence supporting the commissioner's finding that the officer was counseled as to the proper use of pain medications and had entered into a controlled substances agreement. Id., 386–87. Additionally, the court noted that the spouse had failed to present expert testimony demonstrating any medical causal connection between the officer's overdose and his primary compensable injury and that the spouse's sole expert witness' testimony, which attempted to causally tie the officer's depression to his employment, was discredited by the commissioner. Id., 387–88.

The defendants argue that the present case is analogous to *Sapko* in that the decedent's consumption of an excessive amount of alcohol and medications consti-

tuted a superseding cause breaking the chain of causation between the decedent's compensable injuries and his death, such that his death cannot be deemed a direct and natural consequence of his compensable injuries. The defendants point to uncontroverted evidence in the record indicating that the decedent was cognizant that mixing alcohol with his medications was contraindicated, but he nevertheless consumed an excessive amount of alcohol and an excessive amount of medications before his death—actions, the defendants posit, that were too far removed from the compensable injuries to be treated as a link connecting the compensable injuries to the decedent's death.

We disagree with the defendants' contention that this case is analogous to *Sapko*. There is a critical distinction between *Sapko* and this case, namely, the manner of the officer's death in *Sapko* was an accident; id., 367–68; whereas, in the present case, the commissioner found the manner of the decedent's death to be a suicide—a finding that, for the reasons set forth in part I of this opinion, we may not disturb. The conclusion in *Sapko* that the officer's *accidental* overdose on medications, including one that had no connection to the officer's compensable injuries, was a superseding cause breaking the causal link between his compensable injuries and his *accidental* death is wholly sound. See id., 371. In contrast, when an employee's death is found to be a suicide that is the sequelae of a compensable injury, the employee's conduct in carrying out the suicide cannot be regarded as a superseding cause defeating compensability; otherwise, the employee's suicide, by the mere virtue of the method by which the death occurred, would never be compensable under the workers' compensation laws of our state, which would conflict with our appellate precedent. See *Wilder* v. *Russell Library Co.*, 107 Conn. 56, 61–62, 139 A. 644 (1927); *Dixon* v. *United Illuminating Co.*, 57 Conn. App. 51, 61–62 n.8, 748 A.2d 300, cert. denied, 253 Conn. 908, 753 A.2d 940 (2000).

Here, the decedent's consumption of alcohol and medications, which, as the defendants note, the decedent knew to be contraindicated and which resulted in the acute intoxication constituting the physiological cause of the decedent's death, was the method by which the decedent died by suicide; it was not an act untethered to the decedent's compensable injuries and the depression he developed thereafter.[9] Put simply, the decedent's conduct was a link in the chain connecting the compensable injuries to the decedent's death, not a superseding cause breaking the chain of causation.

We further note that how the decedent carried out his suicide is of no moment. Whether "an injured employee [dies by] suicide by alcohol alone or a combination of alcohol with other toxins should make no difference; suicide caused by depression arising from a compensa-

ble injury is compensable," regardless of how the suicide occurred. R. Carter et al., 19 Connecticut Practice Series: Workers' Compensation Law (Supp. 2020–2021) § 5:5, p. 164. That the decedent died by suicide by consuming alcohol and certain medications that bore no relation to his compensable injuries[10] does not affect our analysis.

In sum, iterating that "[d]ecisions in these sorts of cases are necessarily fact driven"; (internal quotation marks omitted) *Sapko* v. *State*, supra, 305 Conn. 385; see 1 L. Larson & T. Robinson, supra, § 10.04, p. 10-13; we conclude that the commissioner's finding, as affirmed by the board, that a chain of causation existed linking the decedent's compensable injuries to his death was supported by the record and not the result of a misapplication of law. Accordingly, we conclude the board properly affirmed the commissioner's award of survivorship benefits to the plaintiff.

The decision of the Compensation Review Board is affirmed.

In this opinion the other judges concurred.

[1] General Statutes § 31-306 provides in relevant part: "(a) Compensation shall be paid to dependents on account of death resulting from an accident arising out of and in the course of employment or from an occupational disease . . . ."

[2] In this appeal, the defendants do not contest the commissioner's finding and award as to the compensability of the decedent's need for knee replacement surgery.

[3] The police report reflected that four other medicine bottles were found in the bedroom, one of which was not labeled and the rest of which contained medications that were not determined to have contributed to the cause of the decedent's death.

[4] The decedent's death certificate was admitted into the record. A portion of the death certificate completed by the OCME reflected that the decedent's cause of death was acute intoxication due to alcohol and the four medications described earlier in this opinion and that the decedent's manner of death was a suicide.

[5] The plaintiff testified that she scheduled the appointment with Tomanelli after observing the decedent crying in his chair, which upset her because it was uncharacteristic of the decedent.

[6] The commissioner found that, prior to the work incident, the decedent sustained a back injury that required surgery, after which he returned to work.

[7] We note that DeJoseph testified that she relied on a number of other factors in making her determination, including the number of pills located around the decedent's body and the presence of an antidepressant in his system.

[8] On appeal from the board's decision in *Sapko*, this court disagreed with the board's conclusion that the superseding cause doctrine was applicable to the case and, thus, concluded that the board improperly upheld the commissioner's finding that the officer's ingestion of excessive quantities of medications was a superseding cause of his death. *Sapko* v. *State*, supra, 123 Conn. App. 24–26. Nevertheless, this court affirmed the board's decision on the basis of the board's proximate cause analysis. Id., 26, 29–30.

[9] The defendants take issue with a finding made by the commissioner that the decedent "died . . . of a drug overdose. *Although he did have some alcohol in his bloodstream at the time of death*, he had ingested a shockingly high number of pills." (Emphasis added.) The defendants contend that the record establishes that the decedent had an excessive amount of alcohol in his body when he died, such that the commissioner minimized the impact of alcohol on the cause of the decedent's death. We do not construe the commissioner's finding as indicating that he overlooked the undisputed evidence in the record demonstrating that the cause of the decedent's death was acute intoxication as a result of the effects of both alcohol and medica-

tions. Earlier in his decision, the commissioner expressly stated that DeJoseph had determined that the mixture of both alcohol and medications had caused the decedent's death. We interpret the commissioner's finding, instead, as rejecting the notion, as the board described it, that the decedent suffered a "death by misadventure due to the abuse of alcohol . . . ." The commissioner found that the decedent had consumed a "shockingly high number of pills," which, for the commissioner, dispelled any suggestion that the decedent's death was accidental. This finding aligned with Waynik's testimony, which the commissioner cited in his decision, that the excessive quantity of medication that the decedent ingested suggested an intent to die. Moreover, the commissioner discredited Selig's expert testimony, in part, because of Selig's belief that it was possible for the decedent to have accidentally consumed the large quantity of medications that he did. Thus, we disagree with the defendants' position that the commissioner overlooked that alcohol was a critical component causing the decedent's death.

Additionally, in their reply brief, the defendants thinly assert that there is no evidence demonstrating that the decedent's consumption of alcohol prior to his death was related to his suicide. The record reflects that the decedent, despite knowing that mixing alcohol with his medications was contraindicated, consumed a large amount of alcohol and later consumed a large quantity of medications, the combination of which caused his death. Although circumstantial, it is reasonable to infer from this evidence that decedent's consumption of alcohol was part and parcel of his suicide.

Finally, we note that there are two arguments that the defendants are not raising on appeal. First, the defendants do not argue that the decedent died by suicide as a result of alcoholism that was unrelated to his employment; indeed, as the defendants acknowledge in their appellate briefs, there is no evidence suggesting that the decedent was an alcoholic suffering from chronic alcohol abuse. Second, although, in their reply brief, the defendants make a passing reference to evidence implying that the decedent's judgment was impaired as a result of his consumption of alcohol, the defendants have not pursued an intoxication defense pursuant to General Statutes § 31-284 (a), which is an affirmative defense that must be asserted and proven by the defendants. See *Gamez-Reyes* v. *Biagi*, 136 Conn. App. 258, 274–75, 44 A.3d 197, cert. denied, 306 Conn. 905, 52 A.3d 731 (2012).

[10] The record reflects that the decedent was prescribed Ativan, one of the medications that DeJoseph determined to be a substantial factor in causing the decedent's death, prior to the work incident.

————————————————